## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

RYAN DERRIMAN,

      Plaintiff,

v.                                    Case No: 8:23-cv-1132-CEH-UAM

MIZZEN AND MAIN LLC,

      Defendant.

_____

## **ORDER**

    This cause comes before the Court on Defendant Mizzen and Main LLC's Motion to Compel Arbitration and Dismiss Plaintiff Ryan Derriman's First Amended Complaint (Doc. 25), Plaintiff's response in opposition (Doc. 33), and Defendant's reply (Doc. 38).[1] After careful consideration, the Court will grant this motion in part, to the extent that it will stay the case and compel the parties to arbitrate these claims.

## **BACKGROUND**

    This putative class-action lawsuit stems from unwanted text messages Plaintiff and others allegedly received from Defendant Mizzen and Main LLC ("Defendant" or "Mizzen and Main"). Doc. 20 ¶¶ 15–41. Defendant is a consumer goods and services retailer. *Id.* ¶ 2. Plaintiff visited the Mizzen and Main website on his mobile

---

[1] The Court has also reviewed and considered Plaintiff's Notice of Supplemental Authority (Doc. 36), which includes, as an attachment, a Southern District of Florida decision applying California law. Doc. 36-1 at 3.

device, which advertised the company's messaging program and offered a discount to customers who signed up for emails and texts. Doc. 25 at 3–4.

Plaintiff then clicked a button labeled "GET 15% OFF NOW when you sign up for email and texts." *Id.* at 4. This action triggered Defendant's system to pre-populate a text message onto Plaintiff's phone. *Id.* at 4–5. The pre-populated message indicated that Plaintiff was opting into Mizzen and Main's program and agreed to receive marketing alerts. *Id.* at 5. Plaintiff sent the message a minute later and, since joining the program, never sent a "STOP" message or otherwise contacted Defendant to withdraw his consent. *Id.* A declaration from one of Defendant's employees states that Plaintiff was manually opted out of the system on April 6, 2023, and has not received or claimed to receive any messages since that date. Doc. 25-1 ¶¶ 10–11.

The enrollment screen for Mizzen and Main's messaging program included a hyperlink to the terms of the offer in a box above the sign-up button. *Id.* at 6. The messaging terms and conditions (the "Messaging Agreement") contained a dispute resolution provision, which reads in part:

> (a) General. In the interest of resolving disputes between you and Mizzen+Main in the most expedient and cost effective manner, you and Mizzen+Main agree that any dispute arising out of or in any way related to these messaging terms and conditions ("Messaging Terms") or your receipt of text messages from Mizzen+Main or its service providers will be resolved by binding arbitration. Arbitration is less formal than a lawsuit in court. Arbitration uses a neutral arbitrator instead of a judge or jury, may allow for more limited discovery than in court, and can be subject to very limited review by courts. Arbitrators can award the same damages and relief that a court can award. This agreement to arbitrate disputes includes all claims arising out of or in any way related to these Messaging Terms, or your receipt of text messages from Mizzen+Main or its service providers whether based in contract, tort, statute, fraud,

2

misrepresentation, or any other legal theory, and regardless of when a claim arises. YOU UNDERSTAND AND AGREE THAT, BY AGREEING TO THESE MESSAGING TERMS, YOU AND Mizzen+Main ARE EACH WAIVING THE RIGHT TO A TRIAL BY JURY OR TO PARTICIPATE IN A CLASS ACTION AND THAT THESE MESSAGING TERMS SHALL BE SUBJECT TO AND GOVERNED BY THE FEDERAL ARBITRATION ACT.

(c) Arbitrator. Any arbitration between you and Mizzen+Main will be governed by the Federal Arbitration Act and the Commercial Dispute Resolution Procedures and Supplementary Procedures for Consumer Related Disputes (collectively, "AAA Rules") of the American Arbitration Association ("AAA"), as modified by these Messaging Terms, and will be administered by the AAA. The AAA Rules and filing forms are available online at www.adr.org, by calling the AAA at 1-800-778-7879, or by contacting Mizzen+Main. The arbitrator has exclusive authority to resolve any dispute relating to the interpretation, applicability, or enforceability of this binding arbitration agreement . . .

*Id.* at 8–10.

Plaintiff later received a text message advertising a Mizzen and Main sale. Doc. 20 ¶ 16. He brought this action in Florida state court alleging violations of the Florida Telephone Solicitation Act ("FTSA") on behalf of himself and all other putative class members who received marketing text messages from Defendant without prior express written consent and from a telephone number not capable of receiving telephone calls. Doc. 1-1. Defendant promptly removed the case to this Court. Doc. 1. Contemporaneously, Defendant moved to compel arbitration and dismiss the case. Doc. 2. Plaintiff filed an amended complaint which mooted the initial motion to compel arbitration. Docs. 20, 21. Soon after, Defendant again moved to compel arbitration and dismiss the case. Doc. 25. Plaintiff timely responded in opposition, and Defendant replied. Docs. 33, 38.

## LEGAL STANDARD

The Federal Arbitration Act (the "FAA") provides that a written arbitration agreement in any contract involving commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA provides a federal "policy favoring arbitration." *Morgan v. Sundance, Inc.,* 596 U.S. 411, 417 (2022). But "[t]he federal policy is about treating arbitration contracts like all others, not about fostering arbitration." *Id.* at 418. (citation omitted).

The existence of a valid arbitration agreement is a threshold issue for ruling on a motion to compel arbitration. *Klay v. All Defendants,* 389 F.3d 1191, 1200 (11th Cir. 2004). If the Court finds that no agreement exists, it cannot compel the parties to settle their dispute in an arbitral forum. *Id.* When a party moves to compel arbitration, "[t]he court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue . . . shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4.

The determination of whether parties have agreed to submit a dispute to arbitration is an issue of law subject to judicial resolution. *See Granite Rock Co. v. Int'l Bhd. of Teamsters,* 561 U.S. 287, 296 (2010). Generally, this requires the district court to apply standard principles of state contract law. *First Options of Chi., Inc. v. Kaplan,* 514 U.S. 938, 939 (1995*); see also P&S Bus. Machs., Inc. v. Canon USA, Inc.,* 331 F.3d

804, 807 (11th Cir. 2003); *Basulto v. Hialeah Auto.,* 141 So. 3d 1145, 1152–56 (Fla. 2014). Under Florida law, a party has a right to arbitrate where: (1) a valid, written agreement exists between the parties containing an arbitration clause; (2) an arbitrable issue exists; and (3) the right to arbitration has not been waived. *Sims v. Clarendon Nat. Ins. Co.,* 336 F. Supp. 2d 1311, 1326 (S.D. Fla. 2004); *Seifert v. U.S. Home Corp.,* 750 So. 2d 633 (Fla. 1999).

Within this district, "[m]otions to compel arbitration are treated generally as motions to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1)." *Owings v. T-Mobile USA, Inc.*, 978 F. Supp. 2d 1215, 1222 (M.D. Fla. 2013). Rule 12(b)(1) motions come in two forms: factual attacks and facial attacks. *Id.* A motion to compel arbitration is typically a factual attack because it asserts that a provision in an extrinsic document—an arbitration clause within the body of a contract—deprives the court of its power to adjudicate the claims. *Id.*

On a factual attack, the trial court may "weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Lawrence v. Dunbar,* 919 F.2d 1525, 1529 (11th Cir. 1990) (citation omitted). District courts within the Eleventh Circuit have long applied the summary judgment standard in such cases, when the merits are intertwined with a jurisdictional question. *See id.* at 1530. If, under a summary judgment-like standard, the district court concludes that there is no genuine dispute as to any material fact concerning the formation of such an

agreement, it "may conclude as a matter of law that [the] parties did or did not enter into an arbitration agreement." *Burch v. P.J. Cheese, Inc.,* 861 F.3d 1338, 1346 (11th Cir. 2017) (quoting *Bazemore v. Jefferson Capital Sys., LLC,* 827 F.3d 1325, 1333 (11th Cir. 2016)). When a genuine dispute exists, "the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4.

## DISCUSSION

The gist of Defendant's argument is that Plaintiff should be compelled to arbitrate his claims because: (1) he affirmatively signed up to receive messages from Defendant; (2) in signing up to receive the messages, he agreed to resolve any dispute related to his receipt of messages through binding arbitration and waived his right to participate in the class he now seeks to represent; and (3) after receiving messages for a year, he filed a class action lawsuit, rather than simply opting out of the program. Doc. 25 at 2–3.

Plaintiff responds that Defendant has no right to compel arbitration because there is no valid agreement—as he did not have inquiry notice of the Messaging Agreement—and that even if he did have notice, Defendant waived its right by removing this case from state court.[2] Doc. 33 at 1–2. Defendant replies that it has not waived its right to arbitrate, the agreement is enforceable under Florida law and federal law, and that Plaintiff's legal authority is distinguishable. *See* Doc. 38.

---

[2] As Defendant points out in its reply (Doc. 38 at 3 n.4), Plaintiff does not challenge the factual assertions in Defendant's motion regarding the appearance of the advertisement that linked to the Messaging Terms, or the consent flow described in the Declaration of Defendant's employee. *See* Doc. 33.

In moving to compel arbitration, Defendant points the Court to an affidavit and extrinsic documents, the veracity of which Plaintiff does not challenge. Docs. 25, 25-1, 33. Based on this evidence and the relevant law, the Court finds that Defendant did not waive its right to arbitration, the Parties entered into a valid agreement to arbitrate, and Plaintiff must therefore be compelled to arbitrate his claims pursuant to the agreement.

### A. Waiver

First, the Court addresses Plaintiff's waiver argument, which fails. Plaintiff argues Defendant waived its right to compel arbitration because it "chose to invoke the jurisdiction and judicial process of this Court through removal." Doc. 33 at 9–12. However, Plaintiff's description of the law surrounding waiver is inaccurate. Instead, under Florida law (which considers the totality of the circumstances surrounding a claim of waiver), there is no basis to find that Defendant has waived its right to compel arbitration by its actions in this litigation.

Federal courts have generally resolved cases regarding whether a party's litigation conduct should result in the loss of its contractual right to arbitrate "as a matter of federal law, using the terminology of waiver." *Morgan,* 596 U.S. at 416–417. Waiver "is the intentional relinquishment or abandonment of a known right," and the waiver analysis focuses on the actions of the person who held the right. *Id.* at 417. (citations and quotations omitted). Waiver may be explicit if a party makes a specific statement of his intent to waive a right, or it may be implied through conduct when

such conduct "make[s] out a clear case." *Air Prod. & Chem., Inc. v. La. Land & Exploration Co.,* 867 F.2d 1376, 1379 (11th Cir. 1989).

*Morgan* abrogated much of the Eleventh Circuit's prior precedent on waiver of arbitration rights. 596 U.S. at 411, 417–418 (*abrogating S&H Contractors, Inc. v. A.J. Taft Coal Co., Inc.,* 906 F.2d 1507, 1514 (11th Cir. 1990)). Before *Morgan*, waiver occurred only when (1) "under the totality of the circumstances, the party has acted inconsistently with the arbitration right," and (2) the party's conduct "has in some way prejudiced the other party." *Gutierrez v. Wells Fargo Bank, NA,* 889 F.3d 1230, 1236 (11th Cir. 2018) (internal citation omitted). Under the previous standard, the Eleventh Circuit imposed "a heavy burden" on any party arguing waiver on the grounds that "federal law favors arbitration." *Id.* (quoting *Stone v. E.F. Hutton & Co.,* 898 F.2d 1542, 1543 (11th Cir. 1990)). *Morgan* effectively struck down both the prejudice and burden-of-proof requirements, as both are arbitration-specific rules that were justified by the policy favoring arbitration. *S&H Contractors,* 906 F.2d at 1514.  Now, Section 6 of the FAA serves as "a bar on using custom-made rules, to tilt the playing field in favor of (or against) arbitration," including in the waiver context. *Morgan*, 596 U.S. at 419 (holding that federal courts cannot "create arbitration-specific variants of federal procedural rules, like those concerning waiver, based on the FAA's policy favoring arbitration").

The first prong of the waiver test, which asked whether a party acted inconsistently with the arbitration right by "substantially participat[ing]" in the

litigation, appears to have been abrogated as well. *Morewitz v. W. of England Ship Owners Mut. Prot. & Indem. Ass'n,* 62 F.3d 1356, 1366 (11th Cir. 1995). This is because the substantial participation standard put a thumb on the scale in favor of arbitration—the approach expressly disclaimed in *Morgan*. 596 U.S. at 419; *see also S&H Contractors,* 906 F.2d at 1514. And the Eleventh Circuit does not apply a "substantial participation" standard for other contractual rights that may be waived by participation in litigation. *See e.g., CMR Constr. & Roofing, LLC v. Empire Indem. Ins. Co.,* 843 F. App'x. 189, 193 (11th Cir. 2021) (finding waiver of appraisal rights where defendants "actively participated" without a requirement that the participation be substantial); *Chmura v. Monaco Coach Corp.,* No. 8:04-cv-2054-SCB-MAP, 2005 WL 1705469, at *2 (M.D. Fla. July 19, 2005) (finding waiver of forum selection clause after participation in litigation in improper forum). Under *Morgan,* such a heightened standard for considering waiver is impermissible—as courts may only place arbitration agreements upon the same footing as other contracts. 596 U.S. at 418 (citing *Granite Rock Co.,* 561 U.S. at 302). Thus, waiver of arbitration rights is now evaluated under the same state-law standards governing other contract waiver issues. *Id.* at 417–418.

Coincidentally, the standard for waiver under Florida law is similar to the previous Eleventh Circuit standard. Specifically, a party may waive its contract right "by actively participating in a lawsuit or taking action inconsistent with that right." *Klosters Rederi A/S v. Arison Shipping Co.,* 280 So. 2d 678, 681 (Fla. 1973). This determination is made by evaluating the totality of the circumstances, and "the question of whether there has been waiver in the arbitration agreement context should

be analyzed in much the same way as in any other contractual context." *Green Tree Servicing, LLC v. McLeod,* 15 So. 3d 682, 687 (Fla. 2d DCA 2009) (citations and quotations omitted); *see also Raymond James Fin. Services, Inc. v. Saldukas,* 896 So. 2d 707, 711 (Fla. 2005).

There are numerous ways in which a party can waive its contract rights. For example, "prosecution or defense of a lawsuit on issues subject to arbitration"—issues on the merits—may waive a right to arbitrate. *Seville Condo. No. One, Inc. v. Clearwater Dev. Corp.,* 340 So. 2d 1243, 1245 (Fla. 2d DCA 1976). The same logic has been applied to a party filing an answer to a pleading seeking affirmative relief without raising the right to arbitration, *Bared & Co. v. Specialty Maint. & Constr., Inc.,* 610 So. 2d 1, 3 (Fla. 2d DCA 1992), or "moving for summary judgment." *Lapidus v. Arlen Beach Condo. Ass'n,* 394 So. 2d 1102, 1103 (Fla. 3d DCA 1981). At least one Florida court has explicitly required something more than removal—such as participation in discovery on the merits of the claims—to find waiver of a claimed right to arbitrate. *See Green Tree,* 15 So. 3d at 684–87.

Here, Defendant timely removed this case to federal court and brought a motion to compel arbitration contemporaneously, without engaging in any other litigation practice beforehand. Docs. 1, 2. After Plaintiff's Amended Complaint mooted the first motion, Defendant filed a second such motion less than two weeks later. Docs. 21, 22. In its renewed Motion, Defendant notes that it does not waive any defenses, objections, or arguments under Rule 12(b)(6) and will pursue those arguments if the Court declines to compel arbitration. Doc. 25 at 1. Consequently, the Court finds that

the totality of the circumstances indicate Defendant never actively participated in the lawsuit or acted in a manner inconsistent with its asserted right to arbitrate the case.

Plaintiff asks this Court to apply a bright-line rule whereby removal constitutes waiver of arbitration rights. Doc. 33 at 11 ("Defendant chose to invoke the judicial process of this Court through removal. This amounts to waiver."). But Florida caselaw rejects such an approach; removal by itself is not automatically enough.

Even the cases Plaintiff cites do not counsel such a simplistic rule. Doc. 33 at 10–12. For example, he quotes *Gaudreau v. MyPillow, Inc.,* No. 6:21-cv-1899-CEM-DAB, 2022 WL 3098950, at *8 (M.D. Fla. July 1, 2022), for the proposition that removal equates to waiver of the right to arbitration. Specifically, Plaintiff cites the decision's reasoning that "MyPillow acted inconsistently with its purported right to arbitrate. Rather than compel arbitration in state court, MyPillow chose to remove the case to this Court." *Gaudreau,* 2022 WL 3098950, at *8. However, Plaintiff omits that "[the defendant] also answered not one, but two complaints filed by Gaudreau against it without mentioning its purported right to arbitrate. Further, [the defendant] only sought to vindicate its purported right to arbitrate after actively participating in this litigation for eight months." *Id*. In fact, removal alone was not held to be enough to constitute waiver in that case.

Plaintiff's citation of *Cabinetree of Wis., Inc. v. Kraftmaid Cabinetry, Inc.,* 50 F.3d 388, 390 (7th Cir. 1995) is also unpersuasive. Doc. 33 at 12. There, the Seventh Circuit found that removal creates a rebuttable presumption of active participation sufficient to constitute waiver of arbitration rights. *Id*. It held, however, that the presumption is

rebuttable where "such [an] invocation does not signify an intention to proceed in a court to the exclusion of arbitration." *Id.* In determining whether this presumption is rebutted, the Seventh Circuit advises courts to consider factors such as diligence in seeking arbitration and any prejudice to the party resisting arbitration. *Id.* at 391. While this approach is not entirely inconsistent with Florida state law, it does not govern this case. Florida law does not contain a bright-line rule regarding the effect of removal. Thus, based on the totality of the circumstances, the Court finds that Defendant has not waived its right to compel arbitration.

### B. Agreement to Arbitrate

Defendant argues that its arbitration clause is part of a valid, enforceable "browsewrap" agreement. Doc. 25 at 10. Further, it contends that the hyperlink to the Messaging Agreement was conspicuous enough to put a reasonably prudent person on inquiry notice, and that Plaintiff should thus be held to the terms of the agreement. *Id.* at 10–12. Plaintiff argues that no agreement was formed. Doc. 33 at 5–9. Specifically, he contends that the link to the terms and conditions was insufficient to put him on notice and create a binding agreement. *Id.* at 7–9. Defendant replies that, as a matter of law, the link directly above the "GET 15% OFF" button (in an underlined font indicating a hyperlink) put Plaintiff on notice that signing up for the messaging program would bind him to the terms and conditions of the Messaging Agreement. Doc. 38 at 2. Based on this notice and Plaintiff's affirmative actions indicating assent, Defendant argues an agreement was formed. *Id.* at 2–5.

Given the specific placement, size, and conspicuousness of the link to the browsewrap agreement, and Plaintiff's affirmative actions indicating assent to it, Plaintiff was put on inquiry notice of the Messaging Agreement and its associated arbitration clause. Moreover, Plaintiff indicated his assent to the agreement twice— once by pressing a button, and again by sending a pre-populated text message. Therefore, as explained below, the Court finds that the Parties entered into a valid browsewrap agreement, and the arbitration clause within the terms of the agreement constitutes an enforceable agreement to arbitrate.

Federal courts apply state-law to determine whether there is a valid agreement to arbitrate. *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944 (1995). In Florida, an enforceable contract requires offer, acceptance, consideration, and sufficient specification of essential terms. *St. Joe Corp. v. McIver,* 875 So. 2d 375, 381 (Fla. 2004). Consequently, courts must first rule on any formation challenges to the contract containing the arbitration clause. *Solymar Invs., Ltd. v. Banco Santander S.A.,* 672 F.3d 981, 990 (11th Cir. 2012). This is because a party cannot be bound by an arbitration clause of a contract to which it did not assent. *See Granite Rock Co. v. Teamsters*, 561 U.S. 287, 299 (2010). Formation requires "mutual assent to certain and definite contractual terms. Without a meeting of the minds on all essential terms, no enforceable contract arises." *Matter of T&B Gen. Contracting, Inc.,* 833 F.2d 1455, 1459 (11th Cir. 1987) (citations omitted).

Florida courts have recognized two main types of internet contracts: (1) clickwrap agreements, where a website directs a purchaser to the terms and conditions

of the sale and requires the purchaser to click a box to acknowledge that they have read those terms and conditions; and (2) browsewrap agreements, where a website merely provides a link to terms and conditions and does not require the purchaser to indicate acknowledgement during the checkout process. In the latter instance, a purchaser can complete the transaction without visiting the terms and conditions page. *Fridman v. 1-800 Contacts, Inc.,* 554 F. Supp. 3d 1252, 1259 (S.D. Fla. 2021). "The defining feature of browserwrap agreements is that the user can continue to use the website or its services without visiting the page hosting the terms of the browserwrap agreement or even knowing that such a webpage exists." *Id.* (cleaned up).

Under Florida law, a browsewrap agreement is enforceable "when the purchaser has actual knowledge of the terms and conditions, or when the hyperlink to the terms and conditions is conspicuous enough to put a reasonably prudent person on inquiry notice." *MetroPCS Commc'ns, Inc. v. Porter,* 273 So. 3d 1025, 1028 (Fla. 3d DCA 2018) (quoting *Vitacost.com, Inc. v. McCants,* 210 So. 3d 761, 762 (Fla. 4th DCA 2017)).

Mizzen and Main's relevant advertisement is pictured below:



Doc. 25-1 at 6.

Just after seeing this ad, Plaintiff clicked (or more likely pressed) the large blue button which reads "GET 15% OFF NOW when you sign up for email and texts." *Id.* Mizzen and Main's system then pre-populated a text message on Plaintiff's phone, which read "Send this text to subscribe to recurring automated personalized marketing alerts (e.g. cart reminders) from Mizzen+Main." *Id.* at 4. Almost immediately, Plaintiff sent the text to enroll in Mizzen's messaging program. *Id.*

The Messaging Agreement is a browsewrap agreement, as Plaintiff was not required to confirm his agreement with the terms, although he had to press the "GET 15% OFF" button to sign up. Under Florida law, the Court can find that the agreement is enforceable if Plaintiff had constructive notice of the terms and conditions. *Porter*, 273 So. 3d at 1028. Thus, the Court considers "the clarity and conspicuousness of the terms" to determine whether a reasonably prudent user would be put on notice of the agreement. *Fridman,* 554 F. Supp. 3d at 1260 (citation and internal alterations omitted). "In the context of web-based contracts, clarity and conspicuousness are a function of the design and content of the relevant interface." *Id.* (citation omitted).

Again, Plaintiff argues that he was not provided notice of the messaging agreement sufficient to constitute a meeting of the minds and an enforceable contract. Doc. 33 at 7–9. He focuses on the link to the Messaging Agreement, claiming that the text was printed in "considerably smaller font than the surrounding website elements, is not in capital letters, is not in a different font color so as to indicate the presence of a hyperlink, and makes no mention of the arbitration clause contained within the Messaging Agreement." *Id.* at 7. Plaintiff also claims that the placement and style of Defendant's form were "intentionally" designed to distract a reasonable consumer from being placed on notice of what they were agreeing to.[3] *Id.*

---

[3] Plaintiff also cites a factually distinguishable case in which the arbitration agreement was a collateral document not specifically incorporated into the relevant terms and conditions, and the court found there was not sufficient inquiry notice. *Goldstein v. Fandango Media, LLC,* No. 9:21-cv-80466, 2021 WL 6617447, at *4 (S.D. Fla. July 27, 2021). This case is dissimilar because the arbitration clause in the Messaging Agreement's Terms is not an

Plaintiff's arguments are unpersuasive. First, he fails to cite evidence or relevant authority that would allow the Court to find that Defendant's form was intentionally designed to distract or mislead a reasonable consumer. Plaintiff also fails to mention that the "Terms" and "Privacy" links are underlined, indicating that they are hyperlinks. While it is true that the hyper-linked text pertaining to the Messaging Terms could have been bolder and larger, the text was prominently placed on top of the (contrasting) dark blue "GET 15% OFF" button. It was placed directly above the sign-up button and set off from the text below it in a box of its own. This placement is conspicuous enough to give Plaintiff notice. *Kravets v. Anthropologie, Inc.,* No. 22-CV-60443, 2022 WL 1978712, at *4 (S.D. Fla. June 6, 2022) ("Assuming that Plaintiff had no actual notice of the Text Terms, the Court is not persuaded that the Text Terms were not conspicuous enough to put a reasonably prudent person on inquiry notice. The Text Terms are located directly above the 'GET FREE SHIPPING NOW' button and contain bold and underlined links to additional terms and conditions. Such a placement is sufficient to provide inquiry notice."); *Temple v. Best Rate Holdings LLC,* 360 F. Supp. 3d 1289, 1305 (M.D. Fla. 2018) ("The Terms and Conditions Hyperlink was placed in a manner conspicuous enough to provide reasonable notice to a prudent

---

incorporated collateral agreement; it is a specific enumerated term within the Messaging Agreement. Doc. 25-1 at 8–10.

Additionally, *Mochan v. Madison Reed Inc.,* No. 22-80915-CIV, 2023 WL 5266322 (S.D. Fla. July 19, 2023), which Plaintiff submitted to the Court as a supplemental authority, is inapposite as it applied California contract law and the court there found that it was not clear whether the plaintiff even had an opportunity to view the agreement in question. *Id.* at *2.

user, thereby requiring the user to affirmatively acknowledge the Terms and Conditions Hyperlink to the Agreement before proceeding. Because the website provided reasonable notice of the Agreement, it is enforceable.").

The browsewrap agreement here also differs from *Fridman* (which Plaintiff cites at Doc. 33, 7–9), where the court ruled that a link failed to create an enforceable browsewrap agreement because it was hidden at the bottom of a website, in addition to appearing in smaller, less prominent font. 554 F. Supp. 3d at 1262–63. Unlike in *Fridman*, Mizzen and Main's link sits directly above the button that Plaintiff pressed, and a reasonably prudent user would find that link sufficiently conspicuous to be put on notice that they were agreeing to the Messaging Terms by clicking the large "GET 15% OFF" button.

In addition to having inquiry notice of the agreement, Plaintiff assented to it in two ways. First, he clicked the button advertising a discount in exchange for joining the Mizzen and Main messaging service. Doc. 25-1 at 3. As Defendants argue, this has been found sufficient to establish an agreement in similar cases. For example, in *Kravets*, a disclaimer similar to the one here was included above a button advertising free shipping in exchange for a customer's agreement to receive emails and texts. 2022 WL 1978712 at *4–5. The Court found that, although the plaintiff was not required to check a box indicating that she had read the terms and conditions, she was nonetheless bound by the browsewrap agreement. *Id.* In part, this was because:

> Statements immediately above the button clearly explain the legal significance of clicking the button by stating that "[b]y signing up via text, you agree to receive recurring automated promotional and personalized

marketing text messages (e.g., cart reminders) from Anthropologie at the cell number used when signing up." *Id.* Statements immediately above the button further invite Plaintiff to view additional terms and policies. *See id.* As such, the legal significance of clicking on the button was adequately explained on the button and in the statements immediately preceding the button.

*Id.* at *5.

Here too, Mizzen and Main provided a sufficient explanation of the legal significance of clicking on the button in the statements immediately above it.

Plaintiff's second relevant action is that, like the plaintiff in *Kravets*, he sent Defendant a pre-populated text message confirming his subscription to recurring messages. *Id.* at *6. Though this second action may be more obviously relevant to the merits of Plaintiff's claims and the issue of consent to receiving communications, which the Court does not reach here, it constitutes further evidence that Plaintiff assented to the Messaging Agreement. *Id.*

Plaintiff also argues that it is material that Mizzen and Main's hyperlink to the Messaging Agreement did not specifically reference the arbitration provision. Doc. 33 at 9. But he cites no authority showing that an arbitration clause within a browsewrap agreement must be specifically referenced in a hyperlink or on a sign-up page. Thus, although the arbitration clause was not described on or above the button, the language immediately above the button, the hyperlink to the Messaging Terms, and Plaintiff's affirmative opt-in text gave Plaintiff sufficient notice of the legal significance of his actions. *Kravets*, 2022 WL 1978712, at *7. Therefore, Plaintiff had inquiry notice of the Messaging Agreement and the arbitration clause within it.

Accordingly, because Plaintiff had inquiry notice of the agreement and indicated his assent to it in two ways, he is subject to the valid written agreement and arbitration clause.

## B. Arbitrable Issue

Defendant argues that Plaintiff's FTSA claims are clearly within the scope of the Arbitration Agreement, which applies to "all claims" "arising out of or in any way related to these Messaging Terms, or your receipt of text messages from Mizzen+Main or its service providers whether based in contract, tort, statute, fraud, misrepresentation, or any legal theory." Doc. 25 at 13–14; Doc. 25-1 at 9. Plaintiff does not argue to the contrary. *See* Doc. 33. To the extent the Court should decide the issue rather than an arbitrator, the Court finds an arbitrable issue exists under the parties' Messaging Agreement—namely whether Defendant violated the Florida Telephone Solicitation Act.[4] *See* Doc. 20.

---

[4] The Court doubts it is the proper institution to decide this question as the Messaging Agreement appears on its face to allocate the issue of arbitrability to an arbitrator. Doc. 25-1 at 9; *see Henry Schein, Inc. v. Archer and White Sales, Inc.,* 139 S.Ct. 524, 529 (2019) ("[w]hen the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue. That is true even if the court thinks that the argument that arbitration agreement applies to a particular dispute is wholly groundless.").

## CONCLUSION

The Court finds that a valid, written agreement exists between the parties containing an arbitration clause, an arbitrable issue exists, and the right to arbitration has not been waived. Thus, the Parties must arbitrate this dispute.

Having found that arbitration is appropriate, the Court turns to the question of how this case should proceed. Defendant moves the Court to dismiss this action, or in the alternative stay all proceedings pending arbitration. Doc. 25 at 17. Plaintiff argues that a stay would be the proper disposition. Doc. 33 at 12–13.

The Eleventh Circuit has generally held that the proper course is to stay the proceedings rather than dismiss the action. *See Bender v. A.G. Edwards & Sons, Inc.,* 971 F.2d 698, 699 (11th Cir. 1992) ("The district court properly found that the state law claims were subject to arbitration, but erred in dismissing the claims rather than staying them. Upon finding that a claim is subject to an arbitration agreement, the court should order that the action be stayed pending arbitration."); *see also Klay,* 389 F.3d at 1203–04 ("For arbitrable issues, the language of Section 3 indicates that the stay is mandatory.*"). Accordingly, the Court will follow suit.

It is therefore **ORDERED**:

1. Defendant Mizzen and Main LLC's Motion to Compel Individual Arbitration and Dismiss Plaintiff's First Amended Complaint (Doc. 25) is **GRANTED-in-part**.

2.  Plaintiff, Ryan Derriman, is compelled to arbitrate the claims brought in this suit against Defendant, Mizzen and Main, LLC.

3.   The parties shall file a notice informing the Court that the arbitration has been concluded, or that their dispute has otherwise been resolved, within ten days of either of such events.

4. This case is **STAYED** pending the arbitration of Plaintiff Ryan Derriman's Claims against Defendant Mizzen and Main, LLC. The motion is otherwise **DENIED,** and the Clerk is **DIRECTED** to administratively close the file.

**DONE** and **ORDERED** in Tampa, Florida on December 29, 2023.

*Charlene Edwards Honeywell*

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties